UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

KENDRICK MYLES

CRIMINAL NO. 17-149-JWD-RLB

JUDGE JOHN W. deGRAVELLES

### RULING AND ORDER

Before the Court is a Motion to Suppress filed by Defendant Kendrick Myles ("Defendant"). ("Motion," Doc. 25). The Government opposes the Motion. (Doc. 29). A hearing was held on May 21, 2018. (Doc. 33; *see also* Doc. 35 ("Hrg. Tr.")). Following the hearing, the parties filed additional briefs in support of their positions. (Docs. 41, 42).

For reasons discussed below, the Motion is denied.

**I.     INITIAL BRIEFING**

Initial briefing on the Motion generally set forth the following factual background:

On July 10, 2017, Agent Nancy Moffat of the Louisiana Department of Probation and Parole contacted Corporal David Kennedy of the Baton Rouge City Police and told Kennedy that she had received information that Defendant was threatening his family members with a firearm. (Doc. 25-1 at 1; Doc. 29-1 at 1; *see also* Hrg. Tr. at 7, 50). Moffat further advised Kennedy that Defendant was a felon prohibited from possessing a firearm and that he was on parole under Moffat's supervision. (Doc. 25-1 at 1). Officers accompanied Moffat to Defendant's residence of record, but Defendant was not there. (*Id.*). The officers also failed to locate Defendant at "an additional residence on Osceola Street." (*Id.* at 1-2). Moffat told the officers that Defendant was known to drive a 2013 Chrysler 200 with "RIP Mama" in the rear window. (*Id.* at 2). "Knowing that [Defendant] frequented the CC Lockdown area," Kennedy, Corporal Jesse Barcelona, and

1

"Corporal Norman," all of the Baton Rouge City Police Department, checked that area and found the car parked in a driveway at 2648 Cedar Street. (*Id.*; *see also* Hrg. Tr. at 31).

Kennedy knocked on the rear door of a house at this address, and the door "swung open." (Doc. 25-1 at 1). Kennedy saw Defendant standing at the kitchen counter and "gave [Defendant] verbal commands" to raise his hands and step to the doorway. (*Id.*). Defendant "complied and was detained." (*Id.*). Kennedy also saw money and illegal drugs "[i]n plain view." (*Id.*). In a rear bedroom "just off the kitchen," Barcelona found a revolver. (*Id.*). A search of Defendant's phone revealed a photo of him holding a revolver identical to the one found in the residence. (*Id.*). Defendant is charged in a three-count Indictment with being a felon in possession of a firearm, possessing cocaine with the intent to distribute, and possessing marijuana. (Doc. 1 at 1-2).

Defendant's Motion argues that the warrantless search was unreasonable and that evidence discovered as a result of it should accordingly be suppressed. (Doc. 25-1 at 2-3). Particularly, Defendant argues that the plain view doctrine did not justify the search, as there is "no evidence of prior justification for police intrusion into the protected area." (*Id.* at 3). Defendant observes that, as a condition of his parole, he was required to submit to searches *by his probation or parole officer*, but Kennedy, Barcelona, and Norman were neither of these. (*Id.* at 3-4). Defendant also contends that there was "no knock and announce the presence of law enforcement [sic]," no authority for officers to detain him absent an arrest warrant, and no authority for officers to search his phone. (*Id.* at 4).

In opposition, the Government first argues that Defendant lacks standing to make a Fourth Amendment challenge, as he has offered no "indicia of ownership" of the house where items were seized and which the Government characterizes as "abandoned." (Doc. 29-1 at 2-3).

2

The Government also contends that contraband was in plain view and was seized after Moffat arrived on the scene. (*Id.* at 3-4). Next, the Government argues that the officers' actions were supported by reasonable suspicion of criminal activity, which ultimately developed into probable cause to enter the house: they were informed that Defendant had been threatening his family members with a firearm, began searching for him based on those reports using a description of his car, and found his car parked outside the house. (*Id.* at 4).

The Government also provides a "brief discussion" of the "plain view" doctrine, observing that the doctrine permits a seizure if: (1) officers lawfully entered the area where the items seized could be plainly viewed; (2) the incriminating nature of the items was immediately apparent; and (3) the officers had the lawful right to access the items. (*Id.* at 4-6). The Government emphasizes that, in this case, the incriminating nature of the seized drugs and firearm (in possession of a felon) was readily apparent. (*Id.* at 6). Moreover, "[o]nce it was established that [Defendant] remained on probation, possessed a firearm and narcotics, and . . . was a felon, the officers had reasonable suspicion, indeed probable cause, to arrest him." (*Id.* at 7).

## II. THE HEARING

The Court held a hearing on May 21, 2018, at which Moffat, Barcelona, and Kennedy testified. (Hrg. Tr. at 2). Prior to the presentation of evidence and testimony, the Government reiterated that Defendant lacked standing to contest a search of the house. (*Id.* at 4). Defense counsel did not dispute that Defendant did not own the house, but he asked "what authority did the police officers have to knock on the door and then have him come to the door and say, you know, 'you're under arrest.'" (*Id.* at 5-6). Defense counsel challenged the officers' right to

3

"knock on the door" or to "even address [Defendant]," contending that they had no reason to question Defendant and arrest him. (*Id.* at 6).

The Government called Moffat as its first witness. She described some of the conditions of Defendant's parole, including that he was forbidden from possessing firearms and that he agreed to searches of his person, property, or residence upon "reasonable suspicion" of his involvement in criminal activity. (*Id.* at 9, 11). Moffat described how she assembled an "arrest team" upon being informed that Defendant was in possession of a firearm and threatening to kill his family members. (*Id.* at 11). According to Moffat, after exhausting the addresses on file for Defendant, she gave the police a description of Defendant's vehicle and asked them to "keep a lookout." (*Id.* at 12). Upon later being informed that officers had located Defendant, Moffat went to the house, which Moffat also characterized as "abandoned." (*Id.* at 13-14). When she arrived, officers advised Moffat that Defendant was already in custody because he was in possession of cocaine when officers "made contact" with him. (*Id.* at 13). Once Moffat arrived, she and others searched the house; an officer eventually located a gun. (*Id.* at 14). While she was at the house, Moffat was "provided with" Defendant's cell phone and began to look through it "because of the gun and the drugs." (*Id.* at 15). She saw a text message from "Junkie Lewis" saying "where is my gun." (*Id.*). Moffat stated that, when she arrived, officers had already taken possession of "the drugs." (*Id.* at 16). On cross-examination, Moffat stated that, in connection with complaints by Defendant's family members, she had reviewed a video in which Defendant said that he would "put a bullet in [a] man's head," although Defendant did not brandish a gun in the video and no one had told Moffat that they saw Defendant with a gun. (*Id.* at 18). On redirect, Moffat confirmed that she was not "100 percent" certain that Defendant had a gun, but

she acted upon information supplied by Defendant's family members for "public safety reasons." (*Id.* at 29).

Barcelona then testified that, on July 10, 2017, he and other officers had been asked by parole agents for assistance in locating Defendant because they had "received some information that [Defendant] was possibly threatening some family members or something with a firearm." (*Id.* at 31-32). According to Barcelona, after locating Defendant's car directly behind the "abandoned house," Kennedy knocked on the back door. (*Id.* at 33). "The door swung open and [Defendant] was standing in the kitchen right there." (*Id.*). According to Barcelona, Kennedy "made contact with [Defendant]" and gave him "verbal commands" to come out. (*Id.*). Barcelona testified that, at a counter where Defendant was standing, Kennedy observed Defendant "messing with" narcotics. (*Id.*). Barcelona further stated that, after Defendant was taken into custody, he and Norman performed a "protective sweep" of the house, and the gun was found during the "sweep." (*Id*. at 33-34). Barcelona stated that Kennedy advised Defendant of his *Miranda* rights and then began questioning him about the incident. (*Id.* at 34). During that questioning, Defendant stated that he was selling crack cocaine to "make ends meet" and that the firearm did not belong to him but belonged to "a crackhead that he knew." (*Id.*).

According to Barcelona, "[w]hile this investigation was going on," parole agents performed a "check" of Defendant's phone and saw a picture of Defendant holding a firearm identical or very similar to the one discovered during the protective sweep. (*Id.* at 35-36). Barcelona stated that Defendant appeared to understand his *Miranda* rights. (*Id.* at 36). On cross-examination, Barcelona stated that the house was a "known drug house" with "a lot of in and out activity," (*id.* at 37), and that he heard but did not actually see what happened between Kennedy and Defendant when Kennedy first entered the house. (*Id.* at 39-40). Barcelona also

stated that he did not remember seeing the picture of Defendant with the gun and he did not know when it was taken.  (*Id.* at 45-46).

Defendant called Kennedy to testify.  (*Id.* at 50).  He confirmed that he did not see the videotaped incident described previously, although he had been informed that Defendant was in possession of a gun and there had been an "incident involving some family members."  (*Id.* at 52).  Kennedy also stated that, after encountering Defendant, he first saw drugs and drug paraphernalia when Defendant began to move after being told to "step out"; initially, he only saw Defendant facing the counter.  (*Id.* at 56-57).  Upon seeing the drugs, Kennedy placed Defendant under arrest "pending the Probation and Parole people coming back to take possession of him."  (*Id.* at 57-58).  After that, Kennedy's attention was generally focused on Defendant, and Barcelona and Norman reentered the house to conduct a sweep.  (*See id.* at 58-59).  Kennedy also testified that he did not perform a search of Defendant's phone or see a picture of Defendant with a gun.  (*Id.* at 62).  Kennedy stated that he did not say anything while knocking on the door of the house and that the door "just swung open" to reveal Defendant standing at the counter.  (*Id.* at 62-63).  On cross-examination, Kennedy stated that he informed Defendant of his *Miranda* rights, which Defendant appeared to understand.  (*Id.* at 63-64).  He also stated that, after Defendant was informed of his *Miranda* rights, he told officers that he was selling drugs to "make ends meet" and that the gun "belonged to a crackhead that he knew."  (*Id.* at 64).  On redirect, Kennedy stated that Defendant also told officers that the gun did not belong to him.  (*Id.* at 64-65).

### III. POST-HEARING BRIEFING

Defendant's post-hearing brief argues that he has standing because there was no evidence submitted during the hearing that Defendant did not reside at the house and that Defendant had

6

"apparent authority . . . based on the totality of the circumstances," as evidenced by the fact that Kennedy felt the need to knock to seek permission to enter. (Doc. 41 at 2). Defendant also reiterates that any reduced privacy interest that he has as a parolee applies only to Moffat, his assigned parole officer. (*Id.* at 3). Finally, Defendant argues that Kennedy saw drugs and drug paraphernalia only after "apprehend[ing], approach[ing] or detain[ing]" Defendant, and Kennedy had no right to do any of these things. (*Id.*).

The Government's post-hearing brief summarizes the testimony at the hearing and generally reiterates arguments previously made. Specifically, the Government contends that Defendant lacks standing to seek suppression, Moffat had the right to search his person and property, and police officers had reasonable suspicion and ultimately probable cause to believe that Defendant was engaged in criminal activity. (Doc. 42 at 6-7).

## IV. DISCUSSION

### a. Standing

The Government argues that Defendant lacks standing to challenge the search of the house and seizure of the drugs and firearm. (Doc. 29-1 at 2-4). Courts in the Fifth Circuit use a two-pronged test to determine whether a defendant has standing to challenge a search or seizure: (1) "whether the defendant can establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized," and (2) "whether that expectation of privacy is one which society would recognize as objectively reasonable." *United States v. Wise*, 877 F.3d 209, 218 (5th Cir. 2017) (citing *United States v. Riazco*, 91 F.3d 752, 754 (5th Cir. 1996)). To be "reasonable," the expectation of privacy must have a basis outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to

understandings that are recognized and permitted by society. *Minnesota v. Carter,* 525 U.S. 83, 88 (1998).

In some circumstances, a person may have a legitimate expectation of privacy inside a home that he does not own. *See Minnesota v. Olson,* 495 U.S. 91, 96-100 (1990) (overnight houseguest had legitimate expectation of privacy: such a guest seeks shelter in another's home "precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside"). However, "one who is merely present with the consent of the householder" does not. *Carter*, 525 U.S. at 90 (individuals present in a home for the purpose of packaging cocaine had no reasonable expectation of privacy and were "essentially present for a business transaction and were only in the home for a matter of hours"). The party making a Fourth Amendment challenge has the burden of establishing standing. *See United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011).

The Government characterizes the house as an "abandoned" house and states that Defendant had no reasonable expectation of privacy there. (Doc. 29-1 at 2-4). Defendant's initial briefing generally did not discuss standing, and defense counsel conceded at the hearing that Defendant did not own the house. (Hrg. Tr. at 5). The parties' briefing and the testimony at the hearing further suggest that the house was abandoned and that any search occurred away from Defendant's "residence of record" or an "additional residence on Osceola Street." (Doc. 25-1 at 1; Hrg. Tr. at 12, 14, 33). Contrary to a suggestion in Defendant's post-hearing brief, (Doc. 41 at 2), it is his burden to establish standing once it is challenged. *See Hernandez*, 647 F.3d at 219; *see also United States v. Cardoza-Hinojosa*, 140 F.3d 610, 613 (5th Cir. 1998). The fact that Kennedy knocked on the door of the house does not inform whether Defendant had in

the house an expectation of privacy that society might recognize as reasonable. *Wise*, 877 F.3d at 218. For the foregoing reasons, the Court agrees with the Government that Defendant has failed to show standing, at least with respect to the search of the house and the seizure of contraband from it.

### b. Initial Approach and Presence at House

Defendant argues that Kennedy did not see evidence of drug paraphernalia until he had already told Defendant to "step out," and that, at that time, Kennedy did not have the right to "apprehend, approach or detain" Defendant. (Doc. 41 at 3; *see also* Hrg. Tr. at 5-6 (defense counsel suggesting that police officers had no "authority" to "have [Defendant] come to the door and say, you know, 'you're under arrest'" and no right to "knock on the door" or "even address [Defendant]")). In connection with this argument, Defendant has suggested that the fact that the encounter took place inside of a house is completely immaterial, such that asserting a privacy interest in the house is unnecessary. (*See* Hrg. Tr. at 6 ("If he'd been outside in the yard, what's the difference? Would there be any difference if they'd found a gun underneath the house? . . . If they had saw him out in the street, what had he done wrong? What was the reason for the engagement between the officers and such? . . . What right did the police have to be there as well without a warrant for anyone's arrest[?]")). Defendant further characterizes his challenge as implicating the "plain view" doctrine's requirement that law enforcement officials lawfully enter the area where items may be plainly viewed. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).

The Fourth Amendment's sweep is neither as categorical nor as broad as Defendant suggests, however: a police officer may often knock on a door or "approach" and question an individual without offending or even implicating the Fourth Amendment. *See, e.g.*, *United*

9

*States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("knock and talk" strategy is a "reasonable investigative tool" that may be used, *inter alia*, to gain an occupant's consent to search); *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (*Miranda* standard applies only to "custodial interrogations"); *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (Fourth Amendment "protects against detention, not questioning"); *see also Mallory v. City of Riverside*, 35 F. Supp. 3d 910, 931 (S.D. Ohio 2014) ("Because the door was ajar, and swung open upon knocking, the expectation of privacy is lessened. In effect the open door created a path of visibility to any curious passerby, and one in which Sgt. Jones could have observed in either his citizen or official capacity. The fact that the policeman may have to crane his neck, or bend over, or squat, does not render the plain view doctrine [in]applicable, so long as what he saw would have been visible to any curious passerby[.]") (citations omitted); *United States v. Sherrill*, 2011 WL 5570841, at *5 (D. Kan. Nov. 16, 2011) ("That officers approach a building without a search warrant does not create a constitutional violation. And a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment. So as the officers knocked on the door, they had not conducted a search in contravention of the Fourth Amendment. Nor did the officers contravene the Fourth Amendment when the door swung open, allowing the officers to see inside. Officer Harden did not use a forceful knock or intend for the door to open. . . . Once the door accidentally opened, part of the interior of the room was in plain view and the officers did not need a warrant to view inside.") (formatting altered).

Moreover, at the time when Defendant was discovered inside the house, Kennedy and other officers had reasonable suspicion of criminal activity sufficient to justify the temporary warrantless detention of Defendant. *See United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013) ("A temporary, warrantless detention of an individual constitutes a seizure for Fourth

Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place; otherwise, evidence obtained through such a detention may be excluded."). Moffat had assembled an arrest "team" based on Defendant's alleged threats toward family members and possession of a firearm and shared information concerning these threats with police officers. (Hrg. Tr. at 11, 31, 51-52); *see also United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007) (under "collective knowledge" doctrine, it is not necessary for the arresting officer to know all of the facts giving rise probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (applying collective knowledge doctrine to reasonable suspicion inquiry). Upon finding Defendant in the house, Kennedy had at least reasonable suspicion that Defendant was involved in criminal activity, and he was therefore justified both in being at the house and in telling Defendant to "step to" the doorway.

For the foregoing reasons, to the extent that Defendant's arguments survived his failure to demonstrate standing, they fail on the merits.

### c. Arrest of Defendant and Search of His Phone

It is unclear whether Defendant raises a distinct challenge to his warrantless arrest. In any event, a warrantless arrest must be supported by probable cause to pass muster under the Fourth Amendment. *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). "Probable cause requires the existence of facts '[] sufficient in themselves to warrant a man of reasonable caution in the belief that' an

11

offense has been or is being committed' and the person to be arrested (or searched) committed it[.]" *United States v. Gordon*, 580 F.2d 827, 832 (5th Cir. 1978) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "Of course, 'probable cause' means something more than 'mere suspicion[.]'" *Id.* (quoting *Brinegar*, 338 U.S. at 175). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232 (1983). "We must also be mindful that probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the laminated total." *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc) (quotation marks omitted).

As discussed *supra*, Kennedy properly arrived at the house, knocked, and told Defendant to "step to" the doorway based on information about Defendant's threats toward family members. As Defendant began to move toward the doorway, Kennedy saw in plain view what appeared to be illegal drugs. (Hrg. Tr. at 56-57). At that point, Kennedy had probable cause to believe that Defendant had committed or was committing a crime. *See, e.g., Gordon*, 580 F.2d at 832. Therefore, Defendant's arrest did not offend the Fourth Amendment. *Sam*, 887 F.3d at 715; *Atwater*, 532 U.S. at 354.

The Motion also states that "officers" improperly searched Defendant's phone upon detaining him. (Doc. 25-1 at 4). However, testimony at the hearing established that Moffat, not police officers, searched the phone following Defendant's arrest "to find out where he was obtaining" contraband. (Hrg. Tr. at 15; *see also id.* at 35-36, 62). As Defendant has repeatedly acknowledged, he has a much reduced expectation of privacy as to Moffat. (Doc. 25-1 at 3-4; Doc. 41 at 2-3); *see also Carter v. St. John Baptist Par. Sheriff's Office*, 2011 WL 6140861, at

*5 (E.D. La. Dec. 9, 2011) (Vance, J.) (parolees and probationers enjoy "conditional liberty" based on the observance of special restrictions); *Samson v. California*, 547 U.S. 843, 846 (2006) (even a "suspicionless search" conducted pursuant to state parole statute did not violate the Constitution); *United States v. Keith*, 375 F.3d 346, 350 (5th Cir. 2004) (no written condition or state regulation was necessary to authorize search of parolee's home based only on reasonable suspicion). Additionally, while the Supreme Court has ruled that officers generally may not conduct a warrantless search of a cell phone incident to arrest, *see Riley v. California,* ⸺ U.S. ⸺⸺, 134 S.Ct. 2473, 2495 (2014) (the "answer to the question of what police must do before searching a cell phone seized incident to an arrest is . . . simple. Get a warrant."), some courts have held that the reasoning of *Riley* does not apply to parolee searches given their much-diminished privacy interests, *see United States v. Johnson*, 875 F.3d 1265, 1273 (9th Cir. 2017).

Here, when Moffat looked through Defendant's phone, there was reasonable suspicion (and indeed probable cause) to believe that Defendant had committed an offense. Given Defendant's much-diminished privacy expectations as to Moffat, the Court cannot find that her actions violated the Fourth Amendment.

## V. CONCLUSION

For the foregoing reasons, the Motion, (Doc. 25), is DENIED.

Signed in Baton Rouge, Louisiana, on August 24, 2018.

 

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**